

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-16-00028-CR

CHRISTOPHER NORRIS CAGLE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law No. 2
Hunt County, Texas
Trial Court No. CR1400364

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss

## OPINION

Approximately thirty-eight minutes elapsed between Hunt County Deputy Kyle Wylesky's initial traffic stop of a pickup truck driven by Christopher Norris Cagle and Texas Department of Public Safety Trooper Robert McDonald's arrival on the scene of the stop as requested to administer field sobriety tests to Cagle. The question before us on this appeal of Cagle's conviction for driving while intoxicated (DWI) is whether, under the circumstances of this case, the delay was reasonable. Because the delay was reasonable under the circumstances, we affirm the trial court's judgment.

Cagle raised this question in his motion to suppress evidence related to his arrest[1] on the basis that such evidence was gathered pursuant to an unreasonably prolonged investigative detention, which he claims violated his constitutional rights. After denying his motion to suppress, the trial court received Cagle's plea of no contest to the DWI charge and found him guilty.[2] Cagle appeals the denial of his motion to suppress.

The evidence relative to Cagle's motion to suppress was submitted by the parties without testimony or hearing.[3] That evidence revealed that Wylesky and Deputy Harvey Potts, also with the Hunt County Sheriff's Office, responded—in separate patrol units—to a report of a disturbance

---

[1]More specifically, Cagle moved for an order suppressing all physical evidence, all oral or written statements, all video and/or audio recordings of Cagle, and all sobriety test results garnered on the evening of his arrest.

[2]Cagle was sentenced to 180 days' confinement in the Hunt County Jail and was ordered to pay a $1,000.00 fine. Cagle's sentence was suspended, and he was placed on community supervision for a period of eighteen months.

[3]This evidence consisted of the Texas Department of Public Safety Traffic Law Enforcement Division Offense Report of Cagle's arrest, a recording of a 9-1-1 call made shortly before Cagle's arrest in which the caller complained of a disturbance outside of her rural Hunt County residence, the onboard dash camera video of Deputy Kyle Wylesky of the Hunt County Sheriff's Office taken December 15, 2013, and the onboard dash camera video of Trooper Robert McDonald of the Texas Department of Public Safety dated December 15, 2013.

outside of a home along U.S. Highway 69 in rural Hunt County at approximately 1:40 a.m. on December 15, 2013. While en route to the home, Potts notified Wylesky that he spotted a truck matching the description of the one that had been at the center of the reported disturbance. While Potts continued to the scene of the earlier disturbance, Wylesky located and began to follow the matching truck. When the truck's driver turned left against a red light, Wylesky initiated the traffic stop and identified the driver as Cagle.

Wylesky discerned a strong odor of alcohol emanating from Cagle, who explained that, before driving to Hunt County, he had been playing at a concert in Tyler. Cagle admitted to having consumed approximately two beers while in Tyler. When Wylesky asked Cagle for his driver's license, Cagle handed him both his license and a credit card. Wylesky returned to his patrol vehicle to run a license check and to ask dispatch to find out if a state trooper was available to assist with a possible DWI. It took approximately eight minutes from the time of the initial stop until Wylesky received the results of the license check and approximately nine minutes from the time of the initial stop for Wylesky to request the assistance of a state trooper. For the next four minutes, Wylesky spoke with Potts on the radio, reported his location and the events that had taken place, and awaited Potts' arrival on the scene.

Potts arrived twelve minutes after the stop had begun. Both Potts and Wylesky spoke with Cagle regarding the incident outside the rural Hunt County residence reported by the 9-1-1 caller. Potts also spoke with the truck's passenger—Cagle's wife—about that incident. The officers apparently determined, after a discussion with both Cagle and his wife, that, while the truck had stopped near the rural residence and the truck alarm had accidentally been activated, no crime had

3

occurred during the time Cagle was stopped there. Cagle and Wylesky also discussed the truck's apparently expired registration. Wylesky then explained to Cagle that the Hunt County Sheriff's Office does not work DWIs and that they were awaiting a call from a state trooper to investigate a possible DWI. This entire series of discussions took approximately five minutes. At that point, approximately seventeen minutes had elapsed from the time the stop began.

The next several minutes were spent awaiting the arrival of the state trooper to assist with the DWI investigation. While waiting, Wylesky and Potts discussed the amount of beer apparently consumed by Cagle and noted that the truck was littered with several beer bottles. Approximately nineteen minutes after the stop began, dispatch notified Wylesky that the area was being worked by only one trooper, who was not immediately available to assist with the DWI investigation.[4] On learning this information, Wylesky spoke with Cagle and asked if Cagle would be willing to get a hotel room in Greenville for the night. Although Cagle agreed to do so, Wylesky, apparently uncomfortable with the idea of permitting Cagle to drive to a hotel, performed a Horizontal Gaze Nystagmus (HGN) test on Cagle. Wylesky spoke with Cagle before conducting the test, at which time Cagle informed him that he consumed two beers in Tyler and had two more beers after having left Tyler. That discussion and brief test consumed approximately two minutes. After having observed Cagle's "eyes bouncing quite a bit," Potts contacted dispatch to check the status of the Trooper's availability. Wylesky contacted dispatch approximately twenty-seven minutes into the stop and requested that an officer with the Greenville Police Department assist with a possible

---

[4]At that point, the stop had continued for approximately twenty-four minutes.

4

DWI. Wylesky later received notice that Trooper McDonald was en route to the scene; Wylesky then cancelled the request for assistance from the Greenville Police Department. McDonald arrived at the scene, performed standard field sobriety tests on Cagle, and ultimately arrested him for DWI. The total elapsed time had been approximately thirty-eight minutes.

The trial court overruled Cagle's motion to suppress and entered findings of fact and conclusions of law.[5]

---

[5]
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

After a suppression hearing concerning the reasonableness of detaining the Defendant until a State Trooper was available to perform Standard Field Sobriety Tests, and a review of the offense reports and videos submitted by the parties, the Court makes the following Finding of Fact, Conclusions of Law, and decision.

### FINDINGS OF FACT

1. On December 15, 2013 Lyndsey Jarvis contacted the Hunt County Sheriff's Office by telephone to report a disturbance outside of her residence off Highway 69 South in Hunt County, Texas. Jarvis informed dispatch she heard banging on the side of her house, a car alarm going off, and two people arguing. Jarvis then reported seeing the people head toward Greenville in a pickup truck pulling a trailer. At approximately 1:40 a.m., Hunt County Deputies Potts and Wylesky were dispatched to Jarvis' residence.

2. While en route to the Jarvis' residence Deputy Wylesky passed a pickup and trailer matching Jarvis' description on Joe Ramsey Blvd. at the Interstate 30 overpass. After turning around to make contact with the individuals in the pickup, Wylesky saw the pickup drive into the left turn lane and make a U-turn. Although the traffic light was green in the direction the pickup truck was going, left turns are controlled by a turn signal which was red. The pickup then pulled onto the right hand shoulder of the roadway where it came to a stop.

3. Wylesky made contact with the driver of the pickup who identified himself as Chris Cagle. While speaking with Cagle, Wylesky observed Cagle's shirt was ripped in several locations and detected a strong odor of an alcoholic beverage on his breath and person. Cagle told Wylesky he consumed two beers in Tyler, Texas while playing a "gig". When Wylesky requested Cagle's driver's license Cagle handed Wylesky his credit card along with his driver's license.

4. Based on his observations of Cagle, Wylesky contacted dispatch to see if there was a State Trooper available to assist with a possible DWI. Wylesky first requested a State Trooper approximately nine minutes after contacting Cagle. While waiting to hear back from dispatch Wylesky updated Potts, who had continued on to check on Jarvis at her residence, over the radio.

5. Having completed his investigation at Jarvis' residence Potts arrived at Wylesky's location twelve minutes and fifteen seconds after Wylesky made contact with Cagle. Potts questioned Cagle about Jarvis' report that Cagle was in front of her residence. Cagle denied stopping in front of Jarvis' residence. Potts then questioned Cagle's wife and she informed him they had stopped in front of Jarvis' residence. The deputies decided that although Cagle may have disturbed Ms. Jarvis, he committed no offense at Jarvis' residence.

6. Approximately seventeen minutes into the stop Potts contacted dispatch to see if they were able to locate a Trooper to assist them. Approximately nineteen minutes into the stop Wylesky and Potts were informed that the only Trooper on duty was on another call. After spending a little over one minute walking Cagle to his pickup so he could retrieve a jacket and give his wife her phone back, Wylesky and Potts discuss their options on how to handle the investigation without a Trooper. Twenty three minutes into the stop Wylesky decided to administer the Horizontal Gaze Nystagmus test on Cagle. Wylesky is not certified to administer the HGN test. Before Wylesky administered the HGN test Cagle volunteered that he drank two beers on stage and two additional beers after they left. While administering the HGN test on Cagle, Wylesky observed Cagle's eyes "bouncing pretty good".

7. Twenty six and a half minutes into the stop Potts contacted dispatch for an update on the Trooper's status. Twenty seven minutes into the stop Wylesky requested Officer Dixon of the Greenville Police Department to come to their location and administer Standard Field Sobriety Tests on Cagle. While waiting on a response from Officer Dixon, Wylesky permitted Cagle to sit in his pickup. Approximately thirty minutes into the stop Wylesky learned Dixon was on his way to the scene. Thirty one and a half minutes into the stop Potts was informed that the State Trooper had finished with his call and was en route to the scene. Approximately thirty eight minutes and forty three seconds into the stop (thirty minutes and forty three seconds after the first request) both Trooper Robert McDonald and Officer Dixon arrived at the scene.

8. Trooper McDonald administered the SFST's on Cagle. McDonald is certified to administer the SFST's. After administering the SFST's McDonald placed Cagle under arrest for Driving While Intoxicated.

CONCLUSIONS OF LAW

1. The Court finds that the HGN test performed by an officer who is not certified to administer the test is a nullity and did not consider that information for any purpose.

2. The Court finds that the deputies' decision to detain the Defendant for Standardized Field Sobriety Tests was based on the smell of alcohol, the Defendant's admission of having ingested alcohol earlier in the evening, and the Defendant's failure to observe the red light for the left turn lane.

3. The Court finds that based on the totality of the circumstances the Defendant's rights were not violated by the thirty minute and forty three second delay to get Trooper McDonald to the scene.

4. The Court further finds there were legitimate law enforcement purposes served by requesting Trooper McDonald to respond to the scene, including having a more experienced DWI officer that was certified to administer the Standardized Field Sobriety Tests handle the DWI investigation.

6

In reviewing rulings on motions to suppress, we review de novo any application-of-law-to-fact issues or mixed questions of law and fact which do not turn on witness credibility and demeanor.[6] *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005). Consequently, we review the trial court's ruling on a motion to suppress in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). Where, as here, the trial court makes findings of fact and conclusions of law, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact-findings, and review de novo the trial court's legal conclusions unless its explicit fact-findings that are supported by the record are also dispositive of the legal ruling. *Id*. at 819.

Again, Cagle's claim is that he was unreasonably detained after the reason for the original stop concluded. The State contends that Cagle's detention was reasonable, given that any delay in the investigation served a legitimate law enforcement purpose.

"No right is held more sacred, or is more carefully guarded, by the common law," than freedom from unreasonable search and seizure as guaranteed by the Fourth Amendment to the United States Constitution. *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *State v. Williams*, 275 S.W.3d

---

5. Based on the totality of the circumstances the thirty minute and forty three second delay between initial stop by Deputy Wylesky and Trooper McDonald's arrival was not unreasonable.

[6]"We review the trial court's decision to deny [Cagle's] motion to suppress evidence by applying a bifurcated standard of review." *See Young v. State*, 420 S.W.3d 139, 141 (Tex. App.—Texarkana 2012, no pet.) (citing *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd)). We afford almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor. *See Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). This deferential standard of review applies to a trial court's determination of historical facts when that determination is based on a recording admitted into evidence at a suppression hearing. *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). We identify no real fact questions turning on credibility or demeanor.

533, 536 (Tex. App.—Texarkana 2008, no pet.). "[A]bsent a warrant or some functional equivalent giving probable cause to arrest, only a limited, investigatory detention of an individual" is permitted. *Burkes v. State*, 830 S.W.2d 922, 925 (Tex. Crim. App. 1991).

"An investigative detention during the course of a traffic stop in which the subject is not free to leave is a seizure for purposes of the Fourth Amendment, and the appellate court must analyze the stop under the reasonableness standard." *Love v. State*, 252 S.W.3d 684, 687 (Tex. App.—Texarkana 2008, pet. ref'd) (citing *Whren v. United States*, 517 U.S. 806, 810 (1996)). "The question of whether a specific search or seizure is 'reasonable' under the Fourth Amendment is subject to de novo review." *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004). "Thus, in deciding whether [Cagle's] continued detention to await the arrival of [McDonald] was 'reasonable' under the specific circumstances presented, we view the trial court's factual findings in the light most favorable to his ruling, but we decide the issue of 'reasonableness' as a question of Fourth Amendment law." *See id*. at 63.

"The determination of whether an investigative detention is reasonable is a two-pronged inquiry: whether the officer's action was justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Love*, 252 S.W.3d at 687 (citing *Terry*, 392 U.S. at 19–20). There is no contention here that the stop was unjustified at its inception.

The reasonableness determination regarding the detention "is a factual one and is made and reviewed by considering the totality of the circumstances existing throughout the detention." *Id*. (citing *Loesch v. State*, 958 S.W.2d 830, 832 (Tex. Crim. App. 1997)); *see Kothe*, 152 S.W.3d at

63.     "Common sense and ordinary human experience must govern over rigid criteria" in determining the reasonableness of the duration of a detention, and "we take into account whether the police diligently pursue their investigation." *United States v. Sharpe*, 470 U.S. 675, 685 (quoting *United States v. Place*, 462 U.S. 696, 709 (1983)).  Additionally, in determining whether the duration of a detention is reasonable, we "may consider legitimate law enforcement purposes served by any delay in the officer's investigation." *Id.*

> In cases involving a DWI investigation, "legitimate law enforcement purposes" include
>
> a delay to permit the arrival of a DWI enforcement officer so that the supervisory officer initiating the stop can return to duty, a delay for the arrival of a video camera so that the DWI investigation and the field sobriety tests can be taped in accordance with department procedures, and a delay for the arrival of a rookie officer who needs training.

*Belcher v. State*, 244 S.W.3d 531, 541 (Tex. App.—Fort Worth 2007, no pet.) (citing *Hartman v. State*, 144 S.W.3d 568, 573 (Tex. App.—Austin 2004, no pet.); *Smith v. State*, No. 03-06-00085-CR, 2007 WL 700834, at *4 (Tex. App.—Austin Mar. 7, 2007, pet. ref'd) (mem. op., not designated for publication); *Dickson v. State*, No. 03-06-00126-CR, 2006 WL 3523789, at *4 (Tex. App.—Austin Dec. 6, 2006, no pet.) (mem. op., not designated for publication)).

Cagle complains that the detention was unreasonably prolonged after the initial reason for the stop—running a red light—was concluded.  The stop was not solely initiated for that purpose, however.  Wylesky had information which led him to conclude that a truck pulling a trailer matching the description of the truck and trailer driven by Cagle had been at the scene of a disturbance in rural Hunt County a short time before the stop.

9

During the initial twelve minutes of the stop, Wylesky asked Cagle questions related to a routine traffic stop, ran a license check, and requested the assistance of a State Trooper to assist with a DWI investigation.[7]  After Potts arrived on the scene, both Cagle and his passenger were questioned about the earlier disturbance in rural Hunt County, on which the deputies received the initial call.  Wylesky also discussed with Cagle the fact that his vehicle registration was apparently expired.  That series of conversations took an additional five minutes.  The record supports the trial court's finding that the deputies determined, after approximately seventeen minutes into the stop, that no offense had occurred during Cagle's stop near the rural Hunt County residence.  Consequently, the first seventeen minutes of the detention related to the traffic offense, the rural Hunt County disturbance, a possible second traffic offense of DWI, and questions related to a routine traffic stop and, thus, did not violate any aspect of the Fourth Amendment.  *See Belcher*, 244 S.W.3d at 540; *see also Kothe*, 152 S.W.3d at 63.  We therefore turn to the question of whether the added delay of approximately twenty-one minutes while waiting for a qualified officer to conduct sobriety testing was reasonable both in purpose and duration.

During that twenty-one minutes awaiting a Trooper's arrival, the deputies were advised by dispatch that the Trooper had been diverted to another matter.  Thereafter, the deputies discussed amongst themselves how to handle the situation, given that a Trooper was apparently unavailable and that Cagle appeared to be intoxicated.  Although Wylesky performed a test of Cagle's eyes during this time frame, the trial court found that "the HGN test performed by an officer who [was]

---

[7]Wyleski reasonably suspected that Cagle could have been driving while intoxicated during the first few minutes of the stop, when Wyleski noticed a strong odor of alcohol coming from Cagle.

10

not certified to administer the test [was] a nullity," and therefore that test was not considered for any purpose. Nevertheless, the record supports the conclusion that the deputies continued their DWI investigation during the time spent awaiting McDonald's arrival. Wylesky had a further discussion with Cagle during this time frame, during which he learned that Cagle had consumed two beers en route from Tyler to Greenville, thus heightening the suspicion that Cagle was intoxicated. After learning that information, both deputies engaged in additional efforts to seek assistance with a DWI investigation from the Greenville Police Department and the Department of Public Safety. Cagle was permitted to sit in his truck while the deputies continued to check on the status of available assistance. McDonald, who was certified to administer DWI sobriety tests, arrived on the scene thirty-eight minutes into the encounter, twenty-one minutes after the deputies determined that Cagle did not commit any new offense during his stop in rural Hunt County.

Similar to these facts are those present in *Belcher*. Belcher was initially stopped by Officer Willenbrock for a traffic offense, but Willenbrock quickly suspected that Belcher was intoxicated. *Belcher*, 244 S.W.3d at 534. Though Willenbrock was authorized to conduct DWI investigations, he contacted Officer Martin, as Martin was more qualified to conduct the investigation. *Id.* A delay of twenty-seven minutes ensued while Willenbrock awaited the arrival of Martin. *Id.* at 540. During that time period, however, the trial court found that Willenbrock asked questions of Belcher which he considered pertinent to his DWI investigation, but did not perform any field sobriety tests. *Id.* at 536. The appellate court determined that this finding was supported by the record. *Id.* at 541.

11

After having made this determination, the *Belcher* court considered whether the length of the delay was unreasonable. In its analysis, the court took into account the fact that Willenbrock expected Martin to arrive shortly after his initial call, but then learned that Martin had been delayed. *Id*. Willenbrock contacted Martin twice during the period of delay in an attempt to ascertain Martin's whereabouts, continually expecting Martin to arrive any minute. *Id*. at 541–42. Further, Willenbrock permitted Belcher to smoke and answer his cell phone during the detention, thus reducing the level of intrusion generated by the detention. *Id*. at 542. The court concluded that, given the totality of the circumstances and the legitimate law enforcement purposes served by waiting for Martin, Belcher's continued detention while awaiting Martin's arrival was not unreasonable. *Id*.

Here, as in *Belcher*, the officer who made the traffic stop developed a reasonable suspicion of DWI soon after the initial stop and requested assistance with a DWI investigation. Here, however, neither Wylesky nor Potts was certified to conduct DWI sobriety tests—thus requiring the assistance of another officer to conduct those tests. In *Belcher*, even though the original officer was authorized to conduct DWI investigations, the court determined that legitimate law enforcement purposes were served by waiting for a second, more qualified, officer to conduct the investigation. *Id*. at 542. Because the assistance of a law enforcement officer to conduct DWI sobriety tests in this situation was necessary, the twenty-one minutes spent awaiting his arrival served legitimate law enforcement purposes.[8] We further conclude that, given the totality of the

[8]In reaching this conclusion, we do not mean to label as reasonable every delay in an investigative detention for the arrival of a law enforcement officer qualified to conduct sobriety testing.

12

circumstances and balancing the public interest served against Cagle's right to be free from arbitrary detention, the twenty-one-minute delay was not unreasonable under the Fourth Amendment.

Viewing the evidence in the light most favorable to the trial court's ruling, we further hold that the trial court did not err in denying Cagle's motion to suppress all evidence obtained as a result of the detention.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     November 22, 2016
Date Decided:       December 29, 2016

Publish