

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00130-CR
_____

JAMES HENRY ELROD, III, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 29421

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Lamar County jury convicted James Henry Elrod, III, of the capital murder[1] of Eddie Hostetler and Cassie Head. In accordance with the jury's assessment of punishment, the trial court sentenced Elrod to life in prison without the possibility of parole. Elrod appeals, claiming that the trial court erred (1) in denying his motion to suppress because he validly invoked his right to counsel,[2] (2) in failing to include a self-defense instruction with regard to both Hostetler and Head, (3) in failing to include a defense-of-third-person instruction, and (4) in failing to include an instruction on the lesser-included offense of murder with regard to Head and Hostetler. Because we find that the trial court (1) did not err in refusing to suppress the recording of Elrod's interrogation, (2) did not err in declining to give the requested defensive instructions, and (3) did not err in failing to include an instruction on the lesser-included offense of murder in the jury charge, we affirm the trial court's judgment.

## I.       Background

Texas Ranger Stacey McNeal was called to the scene of the double homicide of Hostetler and Head by the Lamar County Sheriff's Office. When McNeal arrived at the residence outside of Tigertown in the northwestern part of Lamar County, the first thing he noticed was a strong odor of what he believed to be human decomposition. Head's body had already been discovered by sheriff's deputies on the floor in the closet of the master bedroom. The body was covered with articles of clothing and bags in what appeared to be an attempt to conceal it. A dog food

---

[1]TEX. PENAL CODE ANN. § 19.03(a)(7) (Supp.).

[2]Elrod claims in his brief that he invoked his Sixth Amendment right to counsel. Nevertheless, the briefing relies primarily on Fifth Amendment right to counsel jurisprudence, as is appropriate.

2

sack had been pulled over the head. The medical examiner discovered a gunshot wound to the forehead and determined that to be the cause of death. McNeal believed that the body had been moved to the closet after Head was killed. He opined that the murders happened on or before April 21, 2021, several days before the bodies were discovered.

Hostetler's body was discovered in an equipment shed affixed to the carport approximately one hour after Ranger McNeal arrived on the scene. The body was concealed by tools and equipment, and a dog food sack had been tied over the head. The medical examiner discovered a gunshot wound to the forehead and determined that to be the cause of death. Hostetler's car was unaccounted for.

The unaccounted-for car was a 2008 Cadillac loaned to Hostetler by his mother so that Hostetler could drive Elrod and his wife, Carolyn Elrod, to Oklahoma. Elrod did not have permission to use the Cadillac. Elrod was arrested in McCurtain County, Oklahoma, on April 28, two days after the bodies were discovered.

Carolyn did not testify at trial. Consequently, the only other living eyewitness to what happened in the Hostetler residence was Elrod. At trial, Elrod testified that he met Hostetler when Hostetler came to a party at his house in Idabel, Oklahoma, in January 2021, although he had known him before that time.[3] During the course of the party, Hostetler offered Elrod employment as a mechanic in Tigertown. As a result of that agreement, Elrod and Carolyn moved to Tigertown, where Elrod worked as a mechanic for Hostetler and Carolyn worked as Hostetler's housekeeper. The couple stayed in Hostetler's residence with him as compensation

---

[3]At the party, Elrod and Hostetler smoked methamphetamine together. Elrod admitted that he was a methamphetamine addict.

3

for their work. At some point, Hostetler brought Head home with him. Elrod had known Head for a number of years because they were both from Mt. Herman, Oklahoma.

In April 2021, Hostetler told Elrod that he needed to leave because his mother did not want Elrod and Carolyn staying in the house. Hostetler was planning to drive Elrod and Carolyn back to Oklahoma and borrowed his mother's Cadillac for that purpose. Elrod was working outside when Hostetler returned with the Cadillac and entered the house. Eventually, Elrod entered the house to check on Carolyn's progress in packing for the trip. When Elrod entered his bedroom, he found Head holding Carolyn down as Hostetler was sexually assaulting Carolyn. Elrod stated that he pulled Hostetler out of the room and that Head jumped over him to try to get out of the room. After he checked on Carolyn, Elrod started looking for Head and Hostetler.

He discovered Head in the master bedroom laughing at him. Head had not spoken, but was still giggling, when Elrod picked up a wrench, threw it at her, and hit her in the head. After having offered that testimony, Elrod stated that Head was reaching for something as she was laughing at him. He testified that he did not "know what she was reaching for" but that he believed it was a weapon. Head stood up and looked at Elrod as he threw the wrench. When the wrench struck her, she fell to the floor in front of the dresser. After Head fell to the floor, she said nothing, and she was not moving.

After that, Elrod "went looking" for Hostetler. He found Hostetler in the shed where Hostetler was holding a hammer in his hand. Hostetler did not say anything to Elrod as Elrod approached; instead, he giggled. According to Elrod, Hostetler "c[a]me toward" him as Elrod "picked up the other shop hammer," threw it at Hostetler, and "hit him in the head with it."

4

Hostetler fell to the ground and did not speak. Elrod "didn't stick around long enough to see if he was moving anymore." Instead, he returned to the house to check on Carolyn.

At some point, he felt the need to protect himself because he "didn't know if they was going to get back up or not." Elrod testified that he "feared for [his] life the whole time." When Elrod entered the house through the kitchen, he saw a .22 rifle with ammunition laying on the table. He took the rifle and went to the bedroom where Head laid, motionless, on the floor. Elrod testified that he shot Head because he "didn't want them to get up . . . and try to harm [him] or [his] wife." He stated, "I was fearing for my life."

Next, Elrod returned to the shed where Hostetler was laying where he fell following the hammer blow to the head. Elrod shot Hostetler with the rifle. Elrod returned to the house, threw the rifle onto the couch, and told Carolyn to get in the car. Twenty minutes later, after Elrod finished loading the car, he and Carolyn left. Elrod denied moving Head's body and denied placing a dog food sack over her head. Elrod testified that he left both Head and Hostetler as they were after he shot them. He and Carolyn drove to Nancy Russell's house in Idabel, where Elrod was eventually arrested. Elrod testified that he had not used methamphetamine on the day of the murders and that he was clearheaded at the time.

On cross-examination, Elrod admitted that, since he already had the keys to the Cadillac before the shootings, he could have gotten in the car and left without shooting Hostetler and Head. Elrod further admitted that Hostetler, while lying on the ground before he was shot, was unable to hurt him.

5

Elrod's son, Dallas Elrod, testified that Elrod came to see him in Broken Bow on April 19, 2021. Elrod was driving a Cadillac. Elrod told Dallas that he beat two people to death and then he shot them. He told Dallas that he killed Hostetler first and then killed Head, because she was a witness to the first murder. Elrod did not tell Dallas that he killed Hostetler and Head because Carolyn was sexually assaulted by them. Carolyn, however, told Dallas that she had been sexually assaulted. Dallas testified that he did not believe Carolyn was an honest person.

## II. The Trial Court Did Not Err in Refusing to Suppress Elrod's Interrogation Video

In connection with his investigation, Ranger McNeal conducted a recorded interrogation of Elrod after reading Elrod his *Miranda*[4] rights. Elrod waived those rights and agreed to speak with McNeal. Based on his claim that he clearly requested counsel during the interrogation, Elrod filed a motion to suppress all portions of the recording following his request. The trial court overruled Elrod's motion to suppress and entered findings of fact and conclusions of law.[5] The complete interrogation recording was admitted into evidence and played for the jury.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5]                                          **FINDINGS OF FACT**

1.     The Defendant was suspected of a double homicide alleged to have occurred in Lamar County, Texas. After the killings, it was believed that the Defendant had fled, along with his wife, to Oklahoma in a vehicle taken from the scene. Defendant had been arrested in Oklahoma after Lamar County authorities had issued a warrant for unauthorized use of the vehicle taken from the scene.

2.     The Defendant was therefore in custody on April 29, 2021, when he was interviewed by Ranger Stacey McNeal.

3.     Prior to the interview beginning, Ranger McNeal *mirandized* the Defendant.

4.     The Defendant agreed to give an interview.

5.     During the interview, the following exchange took place at the 19:18 mark:

6

Ranger McNeal:   I don't know because I don't believe you.

The Defendant:   Well then get me my lawyer then . . . . This is over with then.  I ain't get my family killed for nobody.

Ranger McNeal:   You don't want to talk to me anymore?

The Defendant:   You trying to say I am a liar and I say I haven't done nothing.

We do not repeat the entirety of the excerpt here because it appears in the body of the opinion.

## CONCLUSIONS OF LAW

1.      It is well settled that a custodial interrogation must cease when the Defendant invokes his right to an attorney.  *Rhode Island v. Innis*, 446 U.S. 291, 293, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980) (citing *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

2.      However, for the invocation to be effective, it must be unequivocal and unambiguous. *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995).

3.      At a minimum, *Davis* requires that a suspect express a definite desire to speak to an attorney.  *Dinkins*, 894 S.W.2d at 351; *Lucas v. State*, 791 S.W.2d 35, 45 (Tex. Crim. App. 1989) ("The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning.").

4.      Proper inquiry for a court considering an issue such as the one presented here requires a[n] examination of not only the statement itself but also the totality of the circumstances surrounding the statement.  *Dinkins*, 894 S.W.2d at 351.

5.      This inquiry is objective.  In other words, would a reasonable officer in the circumstances understand the Defendant's request to be definite?  As was stated, in *Davis*, "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.["]  *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994).

6.      The Defendant's consent to the interview was self-serving, if anything, as evidenced by his repeated requests to know "what he had done."  Ranger McNeal was not forthcoming with that information.  Therefore, to keep the interview going, the Defendant began to give a version of events that conflicted with the information law enforcement had already acquired.  At the point in time when the Defendant made the statement at issue, it is objectively reasonable for an officer to have construed the statement on different levels.  In other words, was this a deflection by the Defendant because he was caught in a lie?  Was this a threat by the Defendant to squeeze the Ranger for more details of their investigation?  Or, as the Defendant argues, was this truly an invocation of the Defendant's desire to stop the interview and receive counsel?  These reasonable ambiguities led to the Ranger seeking clarification[,] and silence speaks volumes.  If it was the

7

Elrod contends that, even though he implicitly waived his right to counsel by continuing to answer questions during a law enforcement interrogation, that implicit waiver was ineffective because it was the result of "further unconstitutional interrogation by law enforcement."

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. We "afford almost total deference to the trial court's determination of the historical facts, especially when that determination involves an evaluation of the credibility and demeanor of witnesses." *Masterson v. State*, 155 S.W.3d 167, 170 (Tex. Crim. App. 2005) (citing *Maldonado v. State*, 998 S.W.2d 239, 247 (Tex. Crim. App. 1999)). We also "afford nearly total deference to trial courts' rulings on application-of-law-to-fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Carrillo v. State*, 235 S.W.3d 353, 355 (Tex. App.—Texarkana 2007, pet. ref'd) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1991)).

"[W]e review de novo . . . mixed questions of law and fact which do not turn on witness credibility and demeanor." *Cagle v. State*, 509 S.W.3d 617, 622 (Tex. App.—Texarkana 2016, no pet.) (citing *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005)). "Consequently, we review the trial court's ruling on a motion to suppress in the light most favorable to the trial court's ruling." *Id.* (citing *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)).

"Where, as here, the trial court makes findings of fact and conclusions of law, we determine whether the evidence, when viewed in the light most favorable to the trial court's

---

latter, the interview would have stopped when the Defendant said "yes." He didn't reply in that manner[,] so the conversation continued voluntarily.

8

ruling, supports those fact-findings, and review de novo the trial court's legal conclusions unless its explicit fact-findings that are supported by the record are also dispositive of the legal ruling." *Id.* (citing *Kelly*, 204 S.W.3d at 819). "Since all the evidence is viewed in the light most favorable to the trial court's ruling, we are obligated to uphold the denial of [Elrod's] motion to suppress if it was supported by the record and was correct under any theory of law applicable to the case." *Young v. State*, 420 S.W.3d 139, 141 (Tex. App.—Texarkana 2012, no pet.) (citing *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000)).

### B.     Analysis

After Elrod signed a written waiver of his *Miranda* rights, he gave an account of his arrival in Oklahoma. Elrod stated that he and Carolyn had left Paris on a Monday two weeks hence. He recounted that they had been staying with Hostetler—someone he had known from years past—in Tigertown. Elrod paid rent to Hostetler by working on cars for him. Elrod explained that Hostetler's grandmother owned the house in which they were residing, and at some point, Hostetler's mother indicated that she did not want anyone else living in the house.

In his account, Elrod explained that he and Carolyn left Hostetler's home a little before noon after Hostetler asked them to leave. Elrod told Ranger McNeal that he and Carolyn paid someone—whose name was unknown to him—$100.00 for a ride to Oklahoma in a turquoise, Ford Ranger, extended-cab pickup. Elrod explained that he had been staying at "Nancy's place" in Oklahoma for approximately two weeks, where he had done some mechanic work. Neither Elrod nor McNeal mentioned the murders of Hostetler and Head. Elrod repeatedly denied having possession of the Cadillac and offered different excuses for having the keys to the

9

Cadillac and for having Head's ring.  Elrod also denied having any physical confrontation with

either Head or Hostetler.  Following Elrod's account, the following discussion ensued:

| | |
|---|---|
| Ranger McNeal: | The problem, Jamie, is what you told me now—none of that's true.  And you already know that.  And you know that I know that. |
| Elrod: | What was I was supposed to have done?  Please tell me. |
| Ranger McNeal: | You didn't get a ride in a turquoise-colored Ford Ranger to Nancy's.  I know that and you know that.  So it would be better if you just told me the truth. |
| Elrod: | Tell me what I've done, please. |
| Ranger McNeal: | Tell me the truth. |
| Elrod: | I ain't done nothing to nobody.  When people threaten me, I leave. |
| Ranger McNeal: | Who threatened you? |
| Elrod: | Ask Eddie's momma and them. |
| Ranger McNeal: | Who threatened you? |
| Elrod: | That's the Mexican boys who came out there f*****g threatening me. |
| Ranger McNeal: | I thought you said you didn't talk to them. |
| Elrod: |  When I get s**t stuck in my f*****g face and told me to f*****g leave. |
| Ranger McNeal: | Well you didn't tell me none of that. |
| Elrod: | Sometimes it's best to keep your f*****g mouth shut because I ain't trying to get myself in a f*****g . . . getting myself f*****g hurt. |

10

Ranger McNeal:      So what'd they tell you?

Elrod:              What do you think they told me?

Ranger McNeal:      I don't know because I don't believe you.

Elrod:              Well then get me my lawyer then . . . . This is over
                    with then.  I ain't getting my f*****g family killed
                    for nobody.

Ranger McNeal:      You don't want to talk to me anymore?

Elrod:              You trying to say I'm a liar and I say I haven't done
                    nothing.

Ranger McNeal:      I'm saying you're not telling me the truth.

Elrod:              I just don't understand what the f**k I've done.

Ranger McNeal:      Where's the Cadillac?

Elrod:              Huh?

Ranger McNeal:      Where is the Cadillac?

Elrod:              I ain't got no Cadillac.

Ranger McNeal:      You ain't got no Cadillac?

Elrod:              No.

Ranger McNeal:      Where's Eddie's Momma's Cadillac?

Elrod:              I don't have Eddie's Momma's Cadillac.

The interrogation proceeded with no further mention of a lawyer.  During the remainder of the interrogation, Elrod confessed to striking Head in the head with a wrench and striking Hostetler in the head with a hammer.  He denied shooting either victim in the head, moving their bodies, or placing dog food sacks over their heads.  Elrod contends that the interrogation should

11

have ended immediately after he said, "Well then get me my lawyer then . . . . This is over with then."

"When a suspect asks for a lawyer, interrogation must cease until counsel has been provided or the suspect initiates further communication with the police." *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). "This secondary *Miranda* right to counsel is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Beham v. State*, 476 S.W.3d 724, 729 (Tex. App.—Texarkana 2015, no pet.) (footnote omitted) (quoting *Davis v. United States*, 512 U.S. 452, 458 (1994)). "However, in the context of invoking the *Miranda* right to counsel, a suspect must do so 'unambiguously.'" *Id.* (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)).

> "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," then an officer is required neither to end the interrogation nor ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.

*Id.* at 730 (alteration in original) (quoting *Davis*, 512 U.S. at 459).

As a result, "[n]ot every mention of a lawyer will suffice . . . to invoke the Fifth Amendment right to the presence of counsel during questioning." *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). "Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend upon the statement itself and the totality of the surrounding circumstances." *Id.* In determining whether "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," we employ an

12

objective test. *Id.* at 893. "We look to the totality of circumstances to determine whether any statement referencing counsel was really a clear invocation of the Fifth Amendment right; we do *not* look to the totality of the circumstances, however, to determine in retrospect whether the suspect really *meant* it when he unequivocally invoked his right to counsel." *Id.* The question, then, is whether a reasonable police officer would have understood Elrod's statement to be a request for an attorney given the totality of the circumstances.

The trial court reviewed Elrod's recorded interrogation as its sole basis for denying the motion to suppress. The recording reflects Elrod's demeanor and attitude much more clearly than a dry transcript. During the interrogation, Elrod spoke quickly and seemed eager to volunteer information. He often interrupted Ranger McNeal to offer additional information and often seemingly extraneous information. In other words, McNeal had no occasion to prod Elrod to talk. Beyond that, Elrod spoke quickly and, at times, flippantly. By the time McNeal told Elrod that he did not believe Elrod's story, Elrod stated with a flippant, casual offhandedness, "Well then get me my lawyer then . . . . This is over with then." Without pausing (and thus without further questioning by McNeal) Elrod said, "I ain't getting my f*****g family killed for nobody." This statement—made after Elrod said, "[G]et me my lawyer then"—appears to be an invitation for further inquiry by McNeal rather than an expression of the desire to cease the interrogation.

The totality of these circumstances, when viewed from the standpoint of a reasonable officer, reflect that Elrod's statement was not an unambiguous and unequivocal invocation of the right to counsel. *See Davis*, 313 S.W.3d at 338–41; *Beham*, 476 S.W.3d at 730. Rather than

13

continue questioning, though, Ranger McNeal reasonably asked Elrod whether he wanted to talk with McNeal any longer—a statement far removed from the substance of the investigation. Rather than confirm that he no longer wished to talk with McNeal, Elrod continued talking, as reflected in the printed dialogue above.[6]

For these reasons, we conclude that the trial court acted within its discretion in refusing to suppress Elrod's recorded interrogation. We overrule this point or error.

### III.    No Error in Declining to Give Defensive Instructions

At the charge conference, Elrod requested a jury instruction on self-defense as to both Head and Hostetler. He also requested an instruction on defense of third persons based on the alleged sexual assault of Carolyn. The trial court denied each of those requests.

On appeal, Elrod claims that he was entitled to a self-defense instruction with regard to Head because he testified that he believed that she was reaching for a weapon when he threw a wrench at her and knocked her unconscious. He points to the following testimony in support of his claim:

> Q.    [By defense counsel]  All right.  Where did you get the wrench from?
>
> A.    [By Elrod]  Out of the floor, right there by the toolbox.  I didn't know what she was grabbing.  She was -- Cassie was facing me at the door at that house and giggling and I don't know what she was reaching for so I threw the wrench and hit her in the head with it.
>
> Q.    Okay.  Let's back up a little bit.  When you confronted her in the room and she was laughing she was reaching for something, is that correct?

---

[6]Because we find that Elrod's invocation was ambiguous, we need not address the question of whether he waived his right to counsel by continuing to speak with McNeal. *See Cross v. State*, 144 S.W.3d 521 (Tex. Crim. App. 2004).

A. She was right there beside the dresser whenever -- the wrench struck her she fell right in front of the chest.

Q. Okay. But prior to that happening you said she was reaching for something?

A. Yes.

Q. Do you know what she was reaching for?

A. No, sir, I don't know what she was reaching for.

Q. What did you think it was?

A. It was a weapon I know --

Q. At that point you threw the wrench at her. Was she still reaching for something? Was she standing up?

A. She stood up and looked at me as I throwed the wrench. I throwed the wrench.

In addition, Elrod testified that he was in fear for his life.

Next, Elrod claims that he was entitled to a self-defense instruction as to Hostetler because the evidence showed that Hostetler was holding a hammer and moving toward him. Elrod therefore claims that he reasonably believed that attacking Hostetler was immediately necessary to protect himself against Hostetler's use or attempted use of unlawful deadly force. Elrod points to the following testimony in support of his claim:

Q. [By defense counsel] After that happened what did you do?

A. [By Elrod] I went looking for Eddie.

Q. Did you hear him? How did you find him?

A. He was making noise in the shed.

15

Q.      When you say making noise what kind of noise was it?

A.      He was moving stuff around.

Q.      Like moving tools, what?

A.      Tools.  It was just -- he was in there --just a light was in it.

Q.      So you went outside?

A.      Yes, sir.

Q.      And what did you see?

A.      I seen Eddie with a hammer in his hand.

Q.      Did he say anything to you?

A.      No, he -- he was giggling too.  I didn't quite think it was too funny.

Q.      Did he threaten you with a hammer?

A.      Yes, sir.  He picked it up in his hand.

Q.      Did he come towards you?

A.      He come toward me as I picked up the other shop hammer and hit
        him with it.
        . . . .

Q.      So you picked up the hammer.  What did you do next?

A.      I throwed it and hit him in the head with it.

Elrod argues that the trial court erred by omitting his requested jury instructions on self-defense as to both victims and defense of third persons.

16

## A.     Standard of Review and Applicable Law

We review these claims "under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)." *Graves v. State*, 452 S.W.3d 907, 910 (Tex. App.—Texarkana 2014, pet. ref'd). "We first determine whether error exists." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). "If there is no error, our analysis ends." *Id.* (citing *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012)).

"Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Id.* (citing *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007)). "We view the evidence in the light most favorable to the defendant's requested defensive instruction." *Id.* (citing *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017)). "A trial court errs to refuse a self-defense instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements." *Id.*

"[I]f the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue." *Gaspar v. State*, 327 S.W.3d 349, 356 (Tex. App.—Texarkana 2010, no pet.) (quoting *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)). "The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge." *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App.

1984).  "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law."  *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

**B.      Elrod Was Not Entitled to a Self-Defense Instruction Regarding Hostetler or Head**

In accordance with Section 9.32(a) of the Texas Penal Code, "[a] person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force."  TEX. PENAL CODE ANN. § 9.32(a).

Here, the evidence, viewed in the light most favorable to Elrod, reflects no basis on which the trial court could have submitted a self-defense instruction with respect to either victim. As Elrod acknowledged in his brief, the forensic pathologist testified that both Head and Hostetler were killed by a gunshot wound to the head.  The evidence showed that both victims were lying motionless on the ground when Elrod shot them, thus posing no threat to Elrod.  Even if the jury disbelieved the pathologist's testimony—as defense counsel argues could have been the case—and instead believed that Head and Hostetler died as a result of the respective wrench and hammer blows to the head, the record nevertheless fails to support the submission of the requested self-defense instructions.

This is because Elrod testified that both Head and Hostetler fled the bedroom when he walked in.  Head retreated to her bedroom, and Hostetler retreated to the shed.  Having retreated, neither Head nor Hostetler used or attempted to use unlawful deadly force against Elrod. Instead, though, Elrod went looking for Head and Hostetler.  As the trial court explained, Elrod and Carolyn could have left the scene after Head and Hostetler retreated:

18

What the Court understands is Ms. Head retreated to a bedroom, Mr. Hostetler allegedly retreated to a shed. The assault was over, quite clearly. If this were the case Mr. Elrod and [Carolyn] could've gotten in a car and left the scene and so be it. So, whether or not the use of deadly force was immediately necessary, it was not. And if it's not -- if there is not that evidence then the Court is not obliged to include that instruction.

To get self-defense though you have to also look at the defense of the others, whether or not Mr. Elrod could have used deadly force to protect himself. His argument is that once he went to look for Ms. Head or Mr. Hostetler that he became in fear of his life. The question though is he was not protecting another at that time, instead he was advancing on someone. The question is what threat was there to him as he went to search them out. The law is supposed to make sense. I've always believed that the law is supposed to make sense and it is nonsensical to believe that a self-defense instruction would be applicable under these circumstances.

The trial court was correct in its ruling. The use of deadly force is justified "to the degree the actor reasonably believes the deadly force is *immediately necessary*." TEX. PENAL CODE ANN. § 9.32(a)(2) (emphasis added). After the alleged sexual assault, Elrod testified that he checked on Carolyn for "about three seconds" and then "*went to looking for* . . . . Cassie or Eddie, either one, whoever [he] got to run across first." (Emphasis added). After he knocked Head unconscious, Elrod testified that he then "*went looking for Eddie*." (Emphasis added). At that point, Elrod, who was in no immediate danger from either victim, became the aggressor looking to retaliate against Head and Hostetler. This type of behavior—which may prompt a victim to act in such a way as to defend himself—does not fall within the ambit of self-defense. This is because "[s]elf-defense implies defensive and not offensive acts." *Witty v. State*, 203 S.W.2d 212, 218 (Tex. Crim. App. 1947); *Wilcox v. State*, No. 06-22-00100-CR, 2023 WL 2546504, at *4 (Tex. App.—Texarkana Mar. 17, 2023, pet. ref'd) (mem. op., not designated for publication); *see Gibson v. State*, 202 S.W.2d 236, 237 (Tex. Crim. App. 1947) ("[Self-defense]

19

must not exceed the bounds of defense and prevention. There must be an apparent necessity to ward off by force an unlawful act. It is a right based upon necessity."); *see Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998) ("The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.").

For this reason, and because there is no evidence that the use of deadly force against either victim was immediately necessary at any point, we overrule this point of error.

## C. Elrod Was Not Entitled to an Instruction on the Defense of Third Persons

Elrod also complains that he was entitled to, but did not receive, a jury instruction regarding the defense of Carolyn. This complaint is based on Elrod's testimony that, when he entered his bedroom, he found Head holding Carolyn down as Hostetler sexually assaulted Carolyn. Elrod testified that he pulled Hostetler out of the room and that Head jumped over him to get out of the room.

Section 9.33 of the Texas Penal Code provides:

A person is justified in using force or deadly force against another to protect a third person if:

> (1)     under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

> (2)     the actor reasonably believes that his intervention is immediately necessary to protect the third person.

20

TEX. PENAL CODE ANN. § 9.33. "In other words, a defendant is justified in defending a third person if, under the circumstances as the defendant reasonably believes them to be, the third person would be justified in defending himself." *Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016) (plurality op.). To support his claim of entitlement to a defense of third persons instruction, Elrod was required to present some proof of a reasonable belief "that his intervention [was] 'immediately necessary' to protect [Carolyn]." *Id.*

Yet, the uncontroverted evidence shows that, when Elrod entered the bedroom, he pulled Hostetler out and Head fled the room. At that point, as the trial court noted, the threat was over. Elrod's murder of Hostetler and Head was not accomplished to protect Carolyn from deadly force or the threat of deadly force. *See Arnwine v. State*, 20 S.W.3d 155, 159 (Tex. App.— Texarkana 2000, no pet.) ("[A] defendant's belief that conduct was immediately necessary to avoid imminent harm may be deemed unreasonable as a matter of law if undisputed facts demonstrate a complete absence of immediate necessity or imminent harm." (citing *Brazelton v. State*, 947 S.W.2d 644, 648–49 (Tex. App.—Fort Worth 1997, no pet.))). We overrule this point of error.[7]

---

[7]To the extent Elrod claims that the altercation in the bedroom carried through to the time at which he struck Hostetler with a hammer because he was still "under the excitement and passion of the [original] moment," we find this argument to be without merit; it is based on authority that pre-dates, and is at odds with, our current statutory scheme. *See Young v. State*, 180 S.W. 686, 316 (Tex. Crim. App. 1915) ("[I]f deceased was advancing on appellant when he drew his pistol and fired the first shot, and deceased then abandoned the difficulty and fled, and appellant, while laboring under the excitement and passion of the moment, shot as he fled, this would be a case of manslaughter and not murder.").

21

**IV. Elrod Was Not Entitled to a Jury Instruction on the Purported Lesser-Included Offense of Murder with Regard to Head or Hostetler**

In his final points of error, Elrod claims that he should have received a lesser-included-offense instruction in the charge with respect to both Head and Hostetler. In support of this contention, he argues that murder is a lesser-included offense of capital murder, because the only difference between the two offenses was that he murdered more than one person during the course of the same criminal transaction. Elrod maintains that, because he testified that his actions were taken in his own defense and that of Carolyn—if that should be true in either instance—then he committed murder rather than capital murder. We find that the trial court did not err in refusing to submit a lesser-included-offense instruction.

We apply a "two-step analysis . . . to determine whether an instruction on a lesser-included offense should be given to the jury." *State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013). "The first step of the analysis is a question of law that does not depend on the evidence presented at trial." *Id.* At this level of inquiry, we compare "the elements of the offense as alleged in the indictment with the elements of the requested lesser offense." *Id.* "An offense will be a lesser-included offense where 'it is established by proof of the same or less than all the facts required to establish the commission of the offense charged.'" *Id.* (quoting TEX. CODE CRIM. PROC. ANN. art. 37.09(1)).

The Texas Court of Criminal Appeals has long held that murder is a lesser-included offense of capital murder. *Smith v. State*, 297 S.W.3d 260, 275 (Tex. Crim. App. 2009) ("This

22

Court has long held that murder is a lesser-included offense of capital murder.")[8]  Indeed, the State concedes as much.  We, therefore, proceed to the second step of our analysis.

The second step of our analysis "requires us to determine whether the evidence admitted at trial 'would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense.'"  *George v. State*, 634 S.W.3d 929, 937 (Tex. Crim. App. 2021) (quoting *Solomon v. State*, 49 S.W.3d 356, 369 (Tex. Crim. App. 2001)).  "'[I]f some evidence from any source raises a fact issue on whether [the defendant] is guilty of only the lesser [offense],' the defendant is entitled to the instruction 'regardless of whether the evidence is weak, impeached, or contradicted.'"  *Id.* (alteration in original) (quoting *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012)).  "[T]he ultimate inquiry is whether the lesser offense is a valid, *rational* alternative to the charged offense."  *Id.*

Here, Elrod was charged with capital murder for intentionally and knowingly causing Hostetler's death by shooting him with a firearm and for intentionally and knowingly causing Head's death by shooting her with a firearm during the same criminal transaction.  *See* TEX. PENAL CODE ANN. § 19.03(a)(7); *see Feldman v. State*, 71 S.W.3d 738, 752 (Tex. Crim. App. 2002) (jury authorized to convict if it found that appellant murdered both victims during same criminal transaction),[9] *superseded by statute on other grounds*, TEX. CODE CRIM. PROC. ANN. art 37.071 (Supp.).

---

[8]In this case, the indictment charged Elrod with murdering two people during the same criminal transaction.  The elements of murder are subsumed within this definition.  *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(a).

[9]The "same criminal transaction" means "a continuous and uninterrupted chain of conduct occurring over a very short period of time . . . in rapid sequence of unbroken events."  *Jackson v. State*, 17 S.W.3d 664, 669 (Tex. Crim.

Elrod argues that an instruction on the lesser-included offense of murder as to both Head and Hostetler should have been included in the charge because there was some evidence of self-defense and defense of another person. "Had those instructions been submitted, there was a potential for a jury to have found that Elrod committed one, but not two murders," and would therefore not be guilty of capital murder.

This argument rests precariously atop the assumption that self-defense and defense of third-party instructions were (or should have been) included in the charge. They were not. We have further determined that the trial court did not err in declining to submit those instructions. As a result, we overrule this point of error.

## V.     Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:      June 14, 2023
Date Decided:        July 12, 2023

Do Not Publish

---

App. 2000) (quoting *Rios v. State*, 846 S.W.2d 310, 311–12 (Tex. Crim. App. 1991). Elrod does not contend that the murders did not take place during the same criminal transaction.